Argued and submitted September 6, 1985, reversed and remanded January 8, 1986

# SEAL ROCK WATER DISTRICT,
*Respondent,*

*v.*

# CITY OF TOLEDO,
*Appellant.*

(44305; CA A33786)

712 P2d 174

Jeffrey M. Batchelor, Portland, argued the cause for petitioner. With him on the briefs were Daniel Ousley, Toledo, DeMar L. Batchelor, Schwenn, Bradley, Batchelor & Brisbee, Hillsboro, and, Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland.

Eugene K. Richardson, Newport, argued the cause for respondent. With him on the brief was Richardson, Ouderkirk & Hollen, Newport.

Before Gillette, Presiding Judge, and Van Hoomissen and Young, Judges.

YOUNG, J.

## YOUNG, J.

Defendant appeals from a declaratory judgment construing provisions of a contract dealing with a water rate to be paid by plaintiff to defendant. Under the contract, defendant agreed to treat and deliver water to plaintiff. The trial court declared that defendant had overcharged plaintiff, beginning January 5, 1981, established a method for determining the water rate and ordered defendant to repay the overcharges. We reverse and remand.

Plaintiff is a domestic water supply district organized under ORS Chapter 264. Defendant is a municipal corporation. In the early 1970's problems surfaced with respect to the respective water systems. In order to meet state standards, major improvements and expenditures were required. A preliminary engineering study showed that the state standards could be met and substantial savings could be achieved if the water systems were combined as recommended by the study. The parties agreed to do that and, in October 1973, they signed a statement of intent memorializing their agreement. In essence, defendant would build a new water treatment facility and a Siletz River intake and pumping station, with plaintiff paying part of the cost. Plaintiff would build a pipeline to a point where it would connect with defendant's system, and plaintiff would pay part of the cost of the line that defendant would have to build to join with plaintiff's. Plaintiff would also pay a portion of the annual operation and maintenance costs.

The parties succeeded in raising the necessary funds and proceeded to build the facilities. During that period, plaintiff acquired its own water right on the Siletz River. On August 30, 1976, the parties signed a contract to implement the statement of intent. Defendant agreed to treat and deliver to plaintiff up to one million gallons of water a day. The water rate provision which precipitated this action provides:

> "[Plaintiff] agrees to pay to [defendant] for the treatment and delivery of such water the rates as shown on Exhibit 'A' to this agreement which is by this reference incorporated herein. Provided however, that said per gallon rate to be charged to [plaintiff] shall be reviewed annually and adjusted in accordance with [defendant's] actual experience in its cost to produce treated water exclusive of amortization of capital improvements."

Plaintiff's share of the costs, which the contract calls "capital improvements," was roughly one-fourth of the total cost. Plaintiff's share was to be paid partly by a cash payment and partly by 20 annual payments. Despite its payments, plaintiff would acquire no interest in defendant's water system. The term of the contract is 20 years, renewable by mutual agreement.

Although plaintiff's actual consumption of water has increased since 1976, it has never approached one million gallons a day; in 1982, the last year for which there is evidence in the record, it averaged below 400,000 gallons a day in the month of greatest use. Plaintiff originally paid 18 cents per thousand gallons; by the end of 1980 it was paying 28 cents per thousand.[1] In that year defendant commissioned an outside study of its water charges. The consultant recommended that defendant adopt the utility enterprise system of pricing. That system was developed only recently, but it has been widely accepted in the last few years. Under it, the actual cost of treating water includes both operating costs and facility costs. Facility costs include a reserve for replacing existing physical assets, including the treatment plant and pipelines.

The consultant determined the amount plaintiff should pay for water under the utility enterprise system. He identified the facility and operating costs for which he believed plaintiff should be charged, credited it for its capital contributions, estimated its consumption for the next year and recommended a price per thousand gallons which would produce an amount approximately equal to what he believed to be plaintiff's proper share of defendant's costs. Because he construed "amortization" narrowly to mean payments to a sinking fund to retire bonded indebtedness, he did not believe that the contract between plaintiff and defendant limited the facility costs which defendant could include in its charges. Defendant accepted the consultant's approach and increased its charge to plaintiff to 58 cents per thousand gallons effective January 5, 1981, and to 80 cents per thousand gallons

---

[1] The contract does not say who is to set the rate but only that it is to be based on defendant's experience. It appears that plaintiff simply acquiesced in the increases which led to the 28 cent rate.

effective February 1, 1982.[2] Plaintiff paid the increased amounts under protest and brought this action.

The trial court rejected the application of the utility enterprise system method of setting rates under the contract and instead required that the rate be determined each year by projecting forward one year the average of defendant's previous five years' actual experience. It identified certain portions of defendant's annual budget for inclusion in the five-year base; it excluded items of no benefit to plaintiff, along with any consideration of loss of profit, return on investment, depreciation and reserves for replacement of facilities.[3] The court set the rate beginning February 1, 1982, at 29.2 cents per thousand gallons and ordered a ministerial determination of the proper rate for the period January 5, 1981, to February 1, 1982. It gave judgment for plaintiff for what it had paid in excess of those rates, together with statutory interest, and enjoined defendant from setting the rates in any other fashion.

The first issue is whether we review the court's factual findings *de novo* or only to determine if there is evidence to support them. Whether a declaratory judgment is legal or equitable depends on its underlying nature, including the relief requested. *North Pac. Ins. Co. v. Forest Indus. Ins. Exch.,* 280 Or 313, 317, 571 P2d 138 (1977). Although plaintiff requested both equitable relief and money damages, its basic demand is that the court construe the contract between it and defendant. Construction of a contract is usually a legal matter. *See C & B Livestock v. Johns,* 273 Or 6, 10, 539 P2d 645 (1975). That is the underlying nature of this case, and so our review is as of an action at law. *See Salem Resources v. U.S. Consultants,* 75 Or App 249, 251-52, 706 P2d 920 (1985). Accordingly, our review is limited to determining whether the trial court's findings of fact are supported by any substantial evidence and whether such findings are sufficient to support the judgment. *Hawkins v. Teeples and Thatcher,* 267 Or 151, 160, 515 P2d 927 (1973).

---

[2] At the same time defendant restructured its charges to its own consumers in line with the consultant's recommendations.

[3] The consultant had included all of the excluded elements in his determination of facilities costs and thus in his recommendations of what defendant should charge plaintiff.

Because the construction of the contract is a legal determination, the only factual issues in this case relate to the circumstances which led to the making of the contract and to the intent of the parties. ORS 41.740; ORS 42.220. The crucial contract language is "exclusive of amortization of capital improvements." Defendant argues that "amortization" has a precise meaning—payments to a sinking fund to reduce bonded indebtedness—and that that meaning does not cover economic depreciation or reserves to replace physical facilities. Plaintiff argues that "amortization" has a broader meaning in the water utility context and that the parties intended the broader meaning when they entered into this contract.

■ The 1973 version of the Uniform System of Accounts for Class A and B Water Utilities, which the Public Utility Commissioner adopted for all utilities which he regulated,[4] defines "amortization" as "the gradual extinguishment of an amount in an account by distributing such amount over a fixed period over the life of the asset or liability to which it applies, or over the period to which it is anticipated the benefit will be realized."[5] That definition includes the concept of paying for physical facilities over time and is consistent with the arrangement that the parties made in 1976.

■■ If anything is clear in this case, it is that the utility enterprise system of pricing water services has nothing to do with the agreement between the parties. Neither party used it at the time and, so far as the record shows, neither party was even aware of it. No matter how correct it may be as an economic matter, defendant simply had no contractual right to impose it unilaterally.[6] When plaintiff and defendant made

---

[4] Because plaintiff and defendant are municipalities, neither is subject to PUC regulation. However, this definition is evidence of the meaning of "amortization" in the industry and thus is relevant to determining what the parties meant when they used the word.

[5] Defendant objected to the admission of this evidence on the ground that it would change the plain meaning of the term. ORS 42.250 provides:

"The terms of a writing are presumed to have been used in their primary and general acceptation, but evidence is admissible that they have a technical, local, or otherwise peculiar signification and were used and understood in the particular instance, in which case the agreement shall be construed accordingly."

The evidence was admissible.

[6] Defendant attacks the trial court's action, because "it has precluded defendant from replacing its pricing model with another * * *." The court did not do that; defendant did when it made the contract with plaintiff.

their agreement, they had a simpler arrangement in mind: Plaintiff would contribute part of the cost of defendant's system expansion, in return for which defendant would treat and deliver plaintiff's water, charging only the actual cost of the treatment and delivery. Plaintiff's contribution to the "capital improvements" covered all of its obligations for defendant's facilities. The parties may not have expressed their intentions perfectly, but the language they did use, in the light of the meaning of "amortization" then current in the business and the other surrounding circumstances, was adequate. As the trial court found, defendant may charge plaintiff only for its actual costs of treatment and delivery without regard to replacement or depreciation of its facilities.[7]

■     The difficult part of the case is determining from the record what defendant's "actual experience" has been. Defendant's annual budgets, which are the only relevant evidence in the record, and which may be the only evidence available, do not break down its costs in a way which clearly makes possible the necessary calculations. Defendant objects to the formula which the court fashioned from that information. The court took certain portions of the city's budget pertaining to its water department, excluded line items which it determined were of no benefit to plaintiff,[8] and directed that the total charges to plaintiff be the proportion of those costs which plaintiff's consumption of water bears to defendant's consumption. It determined that amount for the period after February 1, 1982, ordered that it be calculated for the previous year and gave plaintiff judgment for what it had paid in excess of the rates the court had determined. Although the trial court made a valiant effort, it did not adequately set the rate which the parties intended plaintiff to pay for defendant's services in treating and delivering water. Its formula included concepts based on the consultant's testimony, although that testimony has nothing to do with the parties' agreement.

---

[7] This limitation on defendant's charges does not, of course, affect plaintiff's continuing obligation for yearly payments on the unpaid portion of its capital contribution.

[8] Defendant points out that the trial court listed only examples of the excluded line items and ended its list with "etc." Any vagueness in the court's description is the result of the difficulty of using defendant's budget documents for this purpose. In the circumstances, the court adequately described the kinds of line items to be excluded, even if it did not name them all. However, as we will discuss, the budget documents are inadequate to achieve the court's purposes.

Plaintiff does not attempt to support the trial court's formula but instead asks us to establish our own; we are not, however, in any better position to do so than was the trial court. Although it appears that certain budget items relate primarily to water treatment and others do not, the record does not allow us to determine exactly how much of each item is properly attributable to treatment and delivery. Under the contract the parties intended that plaintiff would pay those costs of treating and delivering water to plaintiff which defendant would not otherwise incur, such as additional electricity for pumping, chemicals for treatment and wages for those operating the plant. Defendant's budget does not show those items clearly; for instance, it shows the wages of the operating employees but does not show how much of their time is spent on treatment and delivery and how much on other duties.

There is substantial evidence in the record to support the findings of the trial court. The difficulty is that the findings are insufficient to support the judgment. We reverse the judgment and remand to the trial court to take evidence on what it costs to treat and deliver water to plaintiff. On remand, the trial court may make appropriate additional findings, determine what the proper rate has been for all appropriate periods since January 5, 1981, establish a method for making future rate changes that is consistent with the parties' original intent and award judgment to plaintiff for all overcharges, if any, with interest at the statutory rate.

Reversed and remanded for further proceedings not inconsistent with this opinion.